UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SARA RAMIREZ,

Plaintiff,

v.

BISHOP MANOGUE CATHOLIC HIGH SCHOOL, et al.,

Defendants.

Case No. 3:25-cv-00144-ART-CLB

ORDER

Plaintiff Sara Ramirez sued Defendants Bishop Manogue Catholic High School ("Bishop Manogue") and Matthew Schambari, alleging various constitutional and state law violations, after being terminated from her position as a Bishop Manogue basketball coach. (ECF No. 1.) In response, Defendants filed a counterclaim against Ms. Ramirez for defamation. (ECF No. 10.) Before the Court is Ms. Ramirez's motion to dismiss Defendants' counterclaim and her special motion to dismiss under Nevada's anti-SLAPP statute. (ECF Nos. 17, 19.) As detailed below, the Court grants Ms. Ramirez's special motion to dismiss under Nevada's anti-SLAPP statute and denies her motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) as moot.

## I.    BACKGROUND

In October 2019, Bishop Manogue hired Ms. Ramirez as a part-time girls' basketball coach. (ECF No. 10 at ¶ 5.) In 2023, Defendants received multiple complaints from parents of student-athletes regarding Ms. Ramirez's treatment of the players. (*Id.* at ¶ 7.) Due to these repeated complaints, Bishop Manogue administrators decided that Ms. Ramirez should be terminated during the summer of 2023. (*Id.* at ¶ 15.)

When Ms. Ramirez learned that she might be asked to resign, she requested a meeting with Mr. Schambari, Bishop Manogue's President, and Frank Lazarek,

1

Bishop Manogue's Athletic Director. (*Id.* at ¶¶ 16–17.) Mr. Schambari and Mr. Lazarek met with Ms. Ramirez on August 8, 2023, to discuss the complaints about her and Bishop Manogue's concerns regarding her performance. (*Id.* at ¶ 17.) Ms. Ramirez secretly recorded that conversation. (*Id.*) The hour-long conversation largely centered on concerns about Ms. Ramirez's aggressive coaching style, which some players reported was personally demeaning and laced with profanity. (*Id.* at ¶ 18.) As relevant to this litigation, Mr. Schambari also expressed concerns about outside perceptions regarding basketball players receiving scholarships. According to a transcript of the conversation, Mr. Schambari specifically said,

> "And I think that we've got to be super intentional about not supporting or creating a narrative where it looks like, oh, well we're—we're bringing in— we're paying to bring in these brown kids to come and win us basketball games. And then the white kids don't get to play. Now, I know that's BS, but I can see how the narrative starts to get crafted. And so I'd be really intentional with your coaching staff and with yourself personally, that don't have any conversations around money. Just push them right to me."

(ECF No. 19-1 at 57.)

According to her complaint, Ms. Ramirez left this conversation believing that Mr. Schambari wanted her to change her coaching strategy to favor white players over players of color. (ECF No. 1 at ¶ 25–29.) Ms. Ramirez refused to implement this perceived directive and continued to allow her best players to play. (*Id.* at ¶¶ 30–31.)

Mr. Lazarek later pressured Ms. Ramirez to give more playing time to a white, non-scholarship player whose parents had been advocating for her. (ECF No. 19-1 at 101–105.) According to Ms. Ramirez, this same student made statements to other girls on the team indicating that the student and her mom

were attempting to get Ms. Ramirez terminated for "playing 'brown' girls over her." (*Id.* at 10.)

After this conversation, Ms. Ramirez was placed on probation and was given a written list of expectations, including cultivating positive relationships with student-athletes and their families and increased transparency. (ECF No. 10 at ¶ 22.) Bishop Manogue, however, continued to receive complaints about Ms. Ramirez. (*Id.* at ¶¶ 23–24.) Mr. Schambari subsequently asked Teresa Burrows, Bishop Manogue's Dean of Students, to attend the girls' basketball practices to observe. (*Id.* at ¶ 25.)

On March 14, 2024, 20 days after Ms. Ramirez led her team to a state championship, she was terminated. (ECF No. 1 at ¶ 24.) According to Ms. Ramirez, Mr. Schambari justified her termination by stating that Ms. Ramirez "did not listen to them in the preseason meeting." (ECF No. 1 at ¶ 25.)

After Ms. Ramirez was terminated, she spoke to the press and stated: (1) that she was warned before the start of the season about "brown kids" who were attending school on scholarship getting more playing time at the expense of the white players; (2) that after playing the best players, she was fired for "not following directions;" and (3) that Ms. Burrows was instructed to attend practices and games to pressure Ms. Ramirez since she "didn't change." (ECF No. 10 at ¶ 31.)

On March 14, 2025, Ms. Ramirez filed this lawsuit, alleging the following causes of action: (1) retaliation under Title VII, 42 U.S.C. § 2000e-3(a); (2) retaliation under 42 U.S.C. § 1981; (3) retaliation and wrongful termination in violation of public policy; (4) hostile work environment under Title VII, 42 U.S.C. § 2000e-2(a); (5) negligent supervision and retention; (6) negligent infliction of emotional distress; (7) breach of covenant of good faith and fair dealing; and (8) discrimination in violation of NRS 613.330. (ECF No. 1.) Defendants

3

subsequently filed a counterclaim alleging defamation by Ms. Ramirez, based on the statements she made to the press regarding the circumstances surrounding her termination. (ECF No. 10.)

Ms. Ramirez now moves to dismiss Defendants' defamation counterclaim because she argues that her statements directly concern an issue of public interest, which is a protected activity under NRS 41.600—Nevada's anti-SLAPP statute. (ECF No. 19.) Alternatively, Ms. Ramirez moves to dismiss Defendants' counterclaim because it fails to state a cause of action under Rule 12(b)(6). (ECF No. 17.)

## II.       LEGAL STANDARD

### A.  Nevada's Anti-SLAPP Statute

Under NRS 41.650, "[a] person who engages in a good faith communication in furtherance of the right to petition is immune from civil liability for claims based upon the communication." NRS 41.650. Nevada's anti-SLAPP statute was enacted to protect "well-meaning citizens who petition [the] government and then find themselves hit with retaliatory suits known as SLAPP[] [suits]." *John v. Douglas Cnty. Sch. Dist.*, 219 P.3d 1276, 1281 (Nev. 2009), superseded by statute on other grounds as stated in *Shapiro v. Welt*, 389 P.3d 262, 266 (Nev. 2017).

Because it is procedurally treated as a motion for summary judgment, the Court "can only grant the special motion to dismiss if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Id.* (internal quotations and citations omitted). To overcome the special motion to dismiss, the "nonmoving party must provide more than general allegations and conclusions; it must submit specific factual evidence demonstrating the existence of a genuine factual issue." *Id.* at 1281–82 (internal quotations and citations omitted).

Motions brought under Nevada's anti-SLAPP statute follow a two-step,

4

burden shifting framework. Under the first prong, the Court evaluates "'whether the moving party has established, by a preponderance of evidence,' that he or she made the protected communication in good faith." *Rosen v. Tarkanian*, 453 P.3d 1220, 1223 (Nev. 2019) (quoting NRS 41.660(3)(a)). A party makes that showing if the communications fit into one of the four categories in NRS 41.637 and were "truthful or made without knowledge of its falsity." *Id.* (citing NRS 41.637). As relevant here, NRS 41.637(4) covers "[c]ommunication[s] made in direct connection with an issue of public interest in a place open to the public or in a public forum." NRS 41.637(4). If the movant prevails at the first step, the burden then shifts to the nonmoving party to "demonstrate[] with prima facie evidence a probability of prevailing on the claim." *Rosen*, 453 P.3d at 1223 (citation omitted).

Because "Nevada's anti-SLAPP law is substantially similar to California's in both meaning and purpose, [] the Nevada Supreme Court has repeatedly turned to California courts for guidance on interpreting and applying the statutes." *Allstate Ins. Co. v. Belsky*, No. 2:15-CV-02265-MMD-CWH, 2017 WL 7199651, at *2 (D. Nev. Mar. 31, 2017) (citing *Shapiro*, 389 P.3d at 268; *John*, 219 P.3d at 1281).

**III.    ANALYSIS**

**A. Protected Activity**

As relevant here, "NRS 41.637(4) defines a '[g]ood faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern' as any '[c]ommunication made in direct connection with an issue of public interest in a place open to the public or in a public forum, which is truthful or is made without knowledge of its falsehood.'" *Shapiro*, 389 P.3d at 267–68 (quoting NRS 41.637(4)). To fall under the protection of NRS 41.637(4), "a statement must meet three criteria: it must be an issue of public interest, made in public, and true or made without knowledge of its

falsehood." *Moreira-Brown v. Las Vegas Rev. J., Inc.*, 648 F. Supp. 3d 1278, 1287 (D. Nev. 2023), *aff'd*, No. 23-15143, 2024 WL 1596456 (9th Cir. Apr. 12, 2024). The Court addresses these elements in turn.

### 1. Matters of Public Interest

Ms. Ramirez contends that her statements were matters of public interest because they concerned possible discriminatory directives given by leadership at a prominent high school. (ECF No. 19 at 18–20.) Defendants argue that the circumstances surrounding Ms. Ramirez's termination concern a private employment dispute, and not a matter of public interest. (ECF No. 25 at 7–10.)

The Nevada Supreme Court has held that public interest is "broadly defined" and adopted five "guiding principles" to determine whether a public interest exists: (1) "'public interest' does not equate with mere curiosity;" (2) "a matter of public interest should be something of concern to a substantial number of people; a matter of concern to a speaker and a relatively small specific audience is not a matter of public interest;" (3) "there should be some degree of closeness between the challenged statements and the asserted public interest—the assertion of a broad and amorphous public interest is not sufficient;" (4) "the focus of the speaker's conduct should be the public interest rather than a mere effort to gather ammunition for another round of private controversy;" and (5) "a person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." *Abrams v. Sanson*, 458 P.3d 1062, 1066 (Nev. 2020) (citing *Shapiro*, 389 P.3d at 268).

Considering these guiding principles, the Court finds that Ms. Ramirez's statements concern the public's interest in discrimination and athletics at educational institutions. The public has an interest in discrimination in educational settings that is not mere curiosity, as it informs where parents may enroll their students, and as Defendants concede, Bishop Manogue is an

6

educational institution that holds a prominent place in the Reno community. *See e.g., Morrow v. Los Angeles Unified Sch. Dist.,* 149 Cal. App. 4th 1424, 1436–39 (2007) (principal's handling of racially-motivated violence concerned an issue of public interest); *Marca v. Capella Univ.,* No. SA-CV-05642-DOC-MLGX, 2006 WL 8434407, at *4 (C.D. Cal. Feb. 6, 2006) (quality of educational institution and possible discrimination are matters of public concern); *McGarry v. Univ. of San Diego,* 154 Cal. App. 4th 97, 109–110 (2007) (reason for football coach's termination concerned an issue of public interest).

There is also no evidence that Ms. Ramirez's statements were meant to gather ammunition for another round of private controversy or turn an otherwise private matter into a matter of public interest by speaking to the press, because press regarding her termination after winning a state championship already existed, and she was merely providing comment. (ECF No. 19 at 19 n.5, 6.)

In addition to requiring that the communication concern a matter of public interest, NRS 41.637(4) also stipulates that the communication be made "in a place open to the public or in a public forum." NRS 41.637(4). In this case, Ms. Ramirez's statements to press were clearly in a place open to the public or a public forum as news reports, whether online or on the radio, are a classic example of public fora. *See Nygard, Inc. v. Uusi-Kerttula,* 159 Cal. App. 4th 1027, 1038 (2008) (finding that newspapers and magazines are public fora under anti-SLAPP); *Barrett v. Rosenthal,* 146 P.3d 510, 514 n.4 (2006) (websites accessible to the public are public fora under anti-SLAPP statutes).

The Court therefore finds that Ms. Ramirez's statements concern matters of public interest under NRS 41.637(4) and were made in a public forum.

**2. Good Faith Communication**

Ms. Ramirez next argues that her statements were made in good faith, because they were based on her firsthand knowledge and experience, and she believed the statements were true at the time they were made. (ECF No. 19 at 21–23.) In response, Defendants contend that Ms. Ramirez's "assertions that she believed and continues to believe her statements to be true are belied entirely by . . . evidence concerning parent complaints, and a common sense reading of the [preseason meeting] transcript." (ECF No. 25 at 10.)

To succeed on the first prong of Nevada's anti-SLAPP statute, the moving party must also establish, "by a preponderance of the evidence," that the communication was made in good faith. *Rosen*, 453 P.3d at 1223. "A communication is made in good faith when it 'is truthful or is made without knowledge of its falsehood.'" *Id.* (quoting NRS 41.637). A communication is true when the "preponderance of the evidence demonstrates that the gist of the story, or the portion of the story that carries the sting of the [statement], is true." *Id.* at 1224 (internal quotations and citations omitted).

The gist of Ms. Ramirez's statements was true. In the preseason meeting, Mr. Schambari made an explicit statement regarding being intentional about avoiding the perception that "brown kids" were being played more than white players. (ECF No. 19-1 at 57.) While Defendants now argue that an alternative meaning to those words was obvious, Ms. Ramirez's possible misinterpretation does not mean that her statements were false. (ECF No. 25 at 10–13.) Moreover, the gist of Ms. Ramirez's statement, which is that Bishop Manogue leadership expressed racially motivated directives regarding her coaching behavior, is true. (ECF No. 19-1 at 57.) Her other statements are similarly true, as Ms. Burrows did attend Ms. Ramirez's practices to monitor her coaching behavior, and Ms. Ramirez was fired for not following directives given in the preseason meeting.

(ECF No. 10 at ¶¶ 25–27.)

It is even clearer that Ms. Ramirez's statements were not made with knowledge of their falsity. Though the preseason meeting covered a variety of concerns with Ms. Ramirez's coaching, Mr. Schambari clearly directed Ms. Ramirez to be intentional about her coaching behavior when it came to playing "brown kids." (ECF No. 19-1 at 57.) While it is possible that Ms. Ramirez interpreted the statement in a way that Mr. Schambari did not mean, such a conclusion does not give rise to any inference that she made the statements with knowledge of their falsity. When considered with the entirety of the circumstances surrounding her termination, the evidence provides a compelling case that Ms. Ramirez believed her statements about Mr. Schambari's directives and the reason for her termination to be true.

Thus, as to the statements that Ms. Ramirez made to the press regarding the circumstances surrounding her termination from Bishop Manogue, the Court finds that she has satisfied her initial burden under the two-step anti-SLAPP framework, shifting the burden to Defendants to show a probability of prevailing on their defamation counterclaim.

## B. Probability of Prevailing on the Merits

Defendants' counterclaim alleges that Ms. Ramirez made false statements suggesting that Bishop Manogue and Mr. Schambari directed her to ensure that "brown kids" attending Bishop Manogue on scholarship did not get more playing time at the expense of white players. (ECF No. 10 at ¶¶ 31–33.) They also allege that Ms. Ramirez falsely suggested that her failure to follow their directives was the cause of her termination. (*Id.*) These statements, according to Defendants, damaged their reputation. (*Id.* at ¶¶ 39–43.) Ms. Ramirez argues that her statements were true, or substantially true, and that Defendants have failed to show she acted with actual malice, as is required for limited purpose public

figures. (ECF No. 19 at 28–33.)

To state a claim for defamation, a plaintiff must prove: "(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 90 (Nev. 2002). Ms. Ramirez seems to concede that there was an unprivileged publication to a third person and that Defendants suffered damages, as she does not address these elements in her motion. (ECF No. 19.) The Court therefore focuses its analysis on falsity and fault.

Defendants have failed to demonstrate that any of the statements made by Ms. Ramirez were false. The transcript of the preseason meeting shows that Mr. Schambari made statements directing Ms. Ramirez to be intentional with her coaching and playing of "brown kids" and white players. (ECF No. 19-1 at 57.) Defendants do not argue that such a statement was never made; instead, they argue that the conversation contained no explicit or implicit directive to play students in a race-conscious manner. (ECF No. 25 at 11–13, 13–17.) Mr. Schambari may not have meant to imply a discriminatory directive, but his comments telling Ms. Ramirez to be intentional about her coaching so as not to create a perception that "brown kids" were being favored could easily be interpreted as such.

Defendants also argue that Ms. Ramirez's statements regarding being observed by Ms. Burrows and eventually terminated for not following discriminatory directives are obviously false, when viewed against the backdrop of the many complaints about her coaching style. (*Id.*) But once again, Defendants' contention that Ms. Ramirez misinterpreted Mr. Schambari's comments and the reasons for her firing, does not mean that the statements were false. Even Defendants seem to concede that Ms. Burrows was monitoring Ms.

Ramirez's coaching behavior and Ms. Ramirez was fired for not changing her coaching style, though they contend that those actions were motivated by her aggressive coaching style. (*Id.*) The Court thus concludes that Ms. Ramirez's statements were not defamatory because the gist of her statements were substantially true.

The Court agrees with Ms. Ramirez that Bishop Manogue and Mr. Schambari are likely public figures for the purposes of this action. "A person or company can be a limited purpose public figure" when: (1) there is a public controversy, meaning a publicly-debated issue that has ramifications for nonparticipants; (2) the person's role in the controversy is more than trivial or tangential, meaning they took some voluntary act to influence resolution of the public issue; and (3) the "alleged defamation is germane to the person's participation in the controversy." *Oracle USA, Inc. v. Rimini St., Inc.*, 6 F. Supp. 3d 1108, 1129 (D. Nev. 2014). "The determination of whether a party is a public figure, or a limited purpose public figure, is an issue of law to be decided by the court." *Id.* A general public figure is an individual who "achieve[s] such pervasive fame or notoriety that [they] become[] a public figure for all purposes and in all contexts." *Pegasus*, 57 P.3d at 91 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)).

As Defendants have conceded, Bishop Manogue is a prominent private school in the Reno community. (ECF No. 25.) Bishop Manogue's girls' basketball team was especially prominent at the time, as Ms. Ramirez had just led her team to a state championship. (ECF No. 19 at 5.) As such, Bishop Manogue is likely a public figure for this litigation.

Other jurisdictions have consistently held that school superintendents and board members are considered public figures. *See Ghafur v. Bernstein,* 131 Cal. App. 4th 1230, 1237 (2005) (collecting cases). Here, Mr. Schambari's role as

11

Bishop Manogue's President is like that of a school superintendent. The record shows that Mr. Schambari managed the fundraising for Bishop Manogue, managed all schools covered by the Archdioceses of Reno, and was the representative for the dioceses for these schools. (ECF No. 19-1 at 8.) Consequently, the Court finds that Mr. Schambari is likely a public figure.

Because the Court finds that Defendants are likely at least limited purpose public figures, to prove fault for their defamation counterclaim, they must establish that Ms. Ramirez made her statements with actual malice. *See Pegasus*, 57 P.2d at 92. "[A]ctual malice is proven when a statement is published with knowledge that it was false or with reckless disregard for its veracity." *Id.* "Reckless disregard for the truth may be found when the 'defendant entertained serious doubts as to the truth of the statement, but published it anyway.'" *Id.* (quoting *Posadas v. City of Reno,* 851 P.2d 438, 443 (Nev. 1993)). The test is subjective, "focusing on what the defendant believed and intended to convey, and not what a reasonable person would have understood the message to be." *Posadas,* 851 P.2d at 443.

As discussed above, there is no evidence that Ms. Ramirez knew her statements were false or made the statements with reckless disregard to the truth. She has maintained that she believed the statements were true, and a reasonable person would likely interpret Defendants' statements and actions in a similar way as Ms. Ramirez. (ECF No. 19-1 at 3–10.) However, because the Court concludes that Defendants have not made a requisite showing of falsity, the Court need not decide whether Defendants are public figures or whether the challenged statements were made with actual malice.

Defendants have not shown a prima facie case establishing a probability of success on their defamation counterclaim, and as a result, Ms. Ramirez's anti-

SLAPP motion is granted.[1]

## C. Costs and Attorney's Fees

When a special motion to dismiss under NRS 41.660 is granted, a "court shall award reasonable costs and attorney's fees to the person against whom the action was brought." NRS 41.670(1)(a). Ms. Ramirez's anti-SLAPP motion did not, however, address the amount of fees and costs associated with it. (ECF No. 19.) Therefore, to the extent Ms. Ramirez is entitled to recover reasonable costs and attorney's fees, she must file a separate motion requesting such recovery.

## IV. Leave to Amend

Defendants requested leave to amend their counterclaim if Ms. Ramirez's anti-SLAPP motion to dismiss is granted, specifically citing the recent availability of the preseason meeting transcript. (ECF No. 25 at 17–18.)

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). "A district court does not err in denying leave to amend where the amendment would be futile . . . or where the amended complaint would be subject to dismissal." *Saul v. U.S.*, 928 F.2d 829, 843 (9th Cir. 1991) (citations omitted).

The preseason meeting transcript was attached to Ms. Ramirez's anti-SLAPP motion to dismiss and was available for Defendants when composing their response. (ECF No. 19-1.) Because an anti-SLAPP motion to dismiss is akin to a summary judgment motion, the Court considered all evidence presented, including the preseason meeting transcript. *John*, 219 P.3d at 1281–82. As Defendants have not shown that their counterclaim can be cured by amendment, and the special motion to dismiss is procedurally similar to a summary judgment

---

[1] Because the grant of Ms. Ramirez's anti-SLAPP motion is an adjudication on the merits, her motion to dismiss under Rule 12(b)(6) is denied as moot. *See Allstate Ins. Co.*, 2017 WL 7199651, at *3.

motion, the Court denies Defendants' request for leave to amend.

**D. CONCLUSION**

IT IS THEREFORE ORDERED that Ms. Ramirez's special motion to dismiss under NRS 41.600 is GRANTED. (ECF No. 19.)

IT IS FURTHER ORDERED that Ms. Ramirez's motion to dismiss under Rule 12(b)(6) is DENIED AS MOOT. (ECF No. 17.)

DATED THIS 2nd day of March 2026.

_____

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

14